Bruce J. Zabarauskas
Texas Bar No. 24095654
Thompson & Knight LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone:  214-969-2511
e-mail:  bruce.zabarauskas@tklaw.com

*Attorneys for U.S. Bank, National Association*
*as Trustee for the Benefit of Registered Holders*
*of Morgan Stanley Bank of America Merrill Lynch*
*Trust 2013-C12, Commercial Mortgage Pass-Through*
*Certificates Series 2013 C-12*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | |
| | § | **Case No. 20-34408** |
| **KEIV HOSPITALITY, LLC., et al,** | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | |

## SECURED NOTEHOLDER'S MOTION FOR
## RELIEF FROM THE AUTOMATIC STAY AS TO
## DEBTOR KEIVANS HOSPITALITY, INC.

---

### NOTICE PURSUANT TO LOCAL RULE 9013-1

**This is a motion for relief from the automatic stay.  If it is granted, the movant may act outside of the bankruptcy process.  If you do not want the stay lifted, immediately contact the moving party to settle.  If you cannot settle, you must file a response and send a copy to the moving party at least 7 days before the hearing.  If you cannot settle, you must attend the hearing.  Evidence may be offered at the hearing and the court may rule.**

**Represented parties should act through their attorney.**

**There will be a hearing on this matter on February 23, 2021 at 9:30 a.m. in Courtroom 403, United States Bankruptcy Court, 515 Rusk, Houston, TX 77002.**

---

**SECURED NOTEHOLDER'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO DEBTOR KEIVANS HOSPITALITY, INC. – PAGE 1 OF 28**
516952.000434 24551590.3

U.S. Bank, National Association as Trustee for the Benefit of Registered Holders of Morgan Stanley Bank of America Merrill Lynch Trust 2013-C12, Commercial Mortgage Pass-Through Certificates Series 2013 C-12 (the "Secured Noteholder"), as and for its motion (the "Motion") for relief from the automatic stay, respectfully represents:

## Introduction

1.     Keivans Hospitality, Inc. (the "Debtor") operates a Hilton Garden Inn in Katy, Texas, which like all properties in the hospitality industry, has been adversely impacted by the effects of Covid-19.

2.     While the Debtor portrays itself as an honest debtor whose financial woes were caused solely by Covid, the Debtor made substantial pre-petition transfers of funds to affiliates in violation of its loan agreement with the Secured Noteholder, including: (i) **making loans to affiliates at a time when the Debtor was in payment default under its loan agreement with the Secured Noteholder; and (ii) allowing the Debtor's funds to be used to construct a new hotel for a non-debtor entity**.

3.     Not including a PPP loan, which either has been, or will be, forgiven in full under the PPP Loan program, the Debtor has only three creditors: (i) the Secured Noteholder, which holds a first priority lien on all of the Debtor's assets;  (ii) an SBA Loan which the Debtor took out in violation of its loan agreement with the Secured Noteholder; and (iii) arears under its executory, franchise agreement with Hilton, which the Debtors will need to cure in order to assume and continue its operations.

4.     From a financial perspective, while the Debtor's monthly operating reports from the Petition Date (as hereafter defined) through November 2020 purport to show a positive cash

flow, the Debtor was not making any debt service, or real estate tax and insurance reserve payments to the Secured Noteholder during such time. Moreover, the Debtor sustained a substantial loss in December even without having to pay debt service and tax and insurance reserve payments. Thus, the Debtor has been unable during bankruptcy to generate sufficient cash flow to pay debt service and tax and insurance reserves, and its projections show a continuing negative cash flow.

5.     Additionally, the Debtor lacks equity in its property, as established by an appraisal performed by CBRE.

6.     The Debtor has now filed a plan of reorganization which is unconfirmable because: (i) the Debtor cannot obtain an impaired accepting class of claims to vote in favor of its plan; (ii) the plan improperly seeks to require the Secured Noteholder to turnover reserves it is holding to fund shortfalls under its plan; and (iii) the Plan is not feasible.

7.     Accordingly. The Secured Noteholder seeks relief from the automatic stay under Bankruptcy Code § 362(d)(1) and (2) to foreclose upon in its collateral.

## **Background**

8.     On September 1, 2020 (the "Petition Date"), the Debtor filed its voluntary Chapter 11 bankruptcy petition with the Court. [Dkt. No. 1].

9.     Since the Petition Date, the Debtor has been operating its business and managing its property as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

10.     Pursuant to an order of the Court dated September 3, 2020, the Debtor's bankruptcy case is being jointly administered, for procedural purposes only, with the Chapter 11 case filed by Keiv Hospitality, LLC. [Dkt. No. 21].

11.     The Debtor is the ground lessee under a ground lease, (the "Ground Lease") with respect to the real property and improvements located at 2409 Texmati Drive, Katy, Texas (the

"Real Property"). The ground lessor under the Ground Lease, and the owner of the Real Property is Mousavi, LLC, which is an affiliate of the Debtor. Pursuant to an order of the Court dated October 19, 2020, the Ground Lease was assumed by the Debtor under Bankruptcy Code § 365.[1] [Dkt. No. 66].

12. The Debtor owns and operates a 101 room Hilton Garden Inn at the Real Property pursuant to a franchise agreement (the "Franchise Agreement") with Hilton Worldwide, Inc. ("Hilton").

### The Debtor's Assets

13. The Debtor's assets consist primarily of: (i) its leasehold interest in the Ground Lease; (ii) personal property, consisting primarily of fixtures, furnishings and equipment at the Real Property (collectively, the "FFE"); and (iii) cash.

14. According to an appraisal (the "Appraisal"), conducted by CBRE, the fair market value of the Property is $7,300,000 and the fair market value of the FFE is $900,000. A copy of the Appraisal is annexed hereto as Exhibit 3.

15. According to the most recent cash collateral order (the "Amended Agreed Cash Collateral Order"), the Debtor is permitted to hold only $125,000 at the end of each month. All cash in excess of $125,000 is to be paid to the Secured Noteholder as an adequate protection payment. [Dkt No. 87 at p. 7].

### The Claims Against The Debtor's Estate

16. According to the Debtor's schedules of assets and liabilities and claim register, there are only four claims against the Debtor.[2] These claims consist of:

---

[1]      The rent under the Ground Lease is $1 per month. A copy of the Ground Lease is annexed hereto as Exhibit 2.

[2]      Harris County filed a real estate tax claim for 2020 real estate taxes. However, pursuant to the Amended Agreed Cash Collateral Order, the Secured Noteholder paid these taxes from reserves. [Dkt. No. 95 at ¶ 4]. *See*

(i) the Secured Noteholder's claim, which as set forth below is secured by a senior lien on all of the Debtors' assets ($8,919,307.66);

(ii) the United States Small Business Administration (the "SBA") claim, pursuant to a $150,000 SBA Loan, which is secured by a security interest in the Debtors' personal property which is junior to the Secured Noteholder's security interest [Dkt. No. 48 at p. 1];

(iii) a PPP loan (the "PPP Loan") held by Allegiance Bank ("Allegiance"), which is subject to 100% forgiveness pursuant to the terms of the PPP Loan Program ($151,635.00) [Dkt. No. 41 at p. 1][3]; and

(iv) a contingent and unliquidated claim held by Hilton in connection with the Franchise Agreement. [Claim No. 3]. A copy of the Debtor's claims register is annexed hereto as <u>Exhibit 5</u>. A copy of the Debtor's schedules of liabilities is annexed hereto as <u>Exhibit 6</u>.

## The Secured Noteholder's Claim

17. On or about July 30, 2013, Bank of America, N.A. (the "Original Lender") made a loan (the "Loan") to the Debtor in the original principal amount of $9,500,000.00.

18. The Debtor's monthly payment under the Loan is $83,396.06, consisting of $64,867.34 in principal and interest, $14,815.92 in tax reserves and $3,712.82 in insurance reserves. *See* Hilke Dec. at ¶ 11.

19. The Loan is evidenced by, among other things: (i) a promissory note dated July 30, 2013 (the "Note"), which was made and signed by the Debtor and delivered to the Original Lender in the original principal amount of $9,500,000.00, and (ii) a loan agreement between the Debtor as borrower and the Original Lender, as lender, dated July 30, 2013 (the "Loan Agreement"). A copy of the Note is annexed as <u>Exhibit B</u> to the Proof of Claim (as hereafter defined). A copy of

---

*also* Declaration of Cody Hilke (the "Hilke Dec.") in support of the Motion, at ¶ 27, fn 2. A copy of the Hilke Dec. is annexed hereto as <u>Exhibit 1</u>.

[3] *See* 15 U.S.C. § 9005. *See also* Testimony of Ben Mousavi at Section 341 Meeting of Creditors ("341 Meeting Tr.") at pp. 39-40. A copy of the 341 Meeting Tr. Is annexed hereto as <u>Exhibit 4</u>.

**SECURED NOTEHOLDER'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO DEBTOR KEIVANS HOSPITALITY, INC. – PAGE 5 OF 28**
516952.000434 24551590.3

the Loan Agreement is annexed as <u>Exhibit C</u> to the Proof of Claim. The Proof of Claim is annexed hereto as <u>Exhibit 7</u>.

20.     The Loan and the obligations of the Borrower thereunder are secured by, among other things, a Leasehold Deed of Trust, Assignment of Leases and Rents and Security Agreement (the "Leasehold Deed of Trust"), dated as of July 30, 2013, executed by the Borrower for the benefit of the Original Lender, which granted liens on and security interests in *inter alia*, the Debtor's leasehold interest in the Real Property, the leases, rents and reserves from the Real Property and all of the Borrowers' personal property and general intangibles including without limitation accounts (collectively, the "Personal Property"), and the proceeds thereof.  A copy of the Leasehold Deed of Trust is annexed as <u>Exhibit D</u> to the Proof of Claim.

21.     The Leasehold Deed of Trust was recorded in the Harris County Clerk's office (the "Official Records") on August 2, 2013 as Document No. 20130390465.  *Id.*

22.     The Secured Noteholder perfected its security interest in the Debtor's Personal Property pursuant to the UCC financing statements which are included in <u>Exhibit G</u> to the Proof of Claim.

23.     On or about October 16, 2013, the Original Lender assigned, among other things, the Note and Leasehold Deed of Trust to the Secured Noteholder pursuant to among other things, an allonge and Assignment of Leasehold Deed of Trust, Assignment of Leases and Rents and Security Agreement (the "Assignment of Leasehold Deed of Trust"), which was recorded in the Official Records on December 18, 2013 as Document Number 20130629670.  A copy of the Assignment of Leasehold Deed of Trust is annexed as <u>Exhibit E</u> to the Proof of Claim.

**SECURED NOTEHOLDER'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO DEBTOR KEIVANS HOSPITALITY, INC. – PAGE 6 OF 28**
516952.000434 24551590.3

24.     The Secured Noteholder is the current owner and holder of the Note and beneficiary under the Leasehold Deed of Trust, and all other documents executed in connection with the Loan ("Loan Documents"). (Hilke Dec. at ¶ 10.)

**The Amount Of The Secured Noteholder's Claim**

25.     On October 6, 2020, the Secured Noteholder filed its proof of claim (the "Proof of Claim") in the Debtor's bankruptcy case.  (Exhibit 7).  The amount of the Secured Noteholder's claim as of the Petition Date was $8,919,307.66, which is broken down as follows:

| | |
|---|---|
| Principal | $7,467,148.46 |
| Interest | $   207,597.10 |
| Default Interest | $   127,771.20 |
| Prepayment Premium | $   985,272.11 |
| Late Fees | $     20,062.72 |
| Special Servicing Fees | $       4,230.87 |
| Liquidation Fees | $     87,001.83 |
| Interest On Advances | $       2,882.32 |
| UCC Filing Fee | $          110.13 |
| Appraisal Fee | $       5,000.00 |
| Legal Fee | $       7,830.92 |
| Pay Off Processing Fee | $          400.00 |
| Total | $8,919,307.60 |

(Exhibit A to Proof of Claim).  Annexed hereto as Exhibit 8 is a loan history which shows payments and credits on the Loan through the Petition Date.  (Hilke Dec. at ¶ 12.)

26.     Subsequent to the Petition Date, the Debtor has incurred legal fees and servicing fees of an additional $50,167.70 ($43,945.06 in legal fees and expenses and $6,222.64 in servicing fees) through December 31, 2020, and is continuing to incur such fees and expenses.[4]  (Hilke Dec. at ¶ 13.)

27.     The Debtor has filed an objection to the amount of the Secured Noteholder's claim. [Dkt. No. 14 in Case No. 20-34409].  A hearing on this claim objection is scheduled for February

---

[4]     The Secured Noteholder's claim has also incurred post-petition interest at the default rate to the extent the Court were to determine that the Secured Noteholder is oversecured.

17, 2021.

## The Reserves Under The Loan Agreement

28.     The Loan Agreement between the Debtor and Secured Noteholder mandates the posting of certain reserves by the Debtor with the Secured Noteholder.  (Hilke Dec. at ¶ 14).

29.     Section 9.2 of the Loan Agreement provides that the Debtor shall fund a Replacement Reserve Account in the amount of $650,000.  (Loan Agreement at § 9.2).  The purpose of the Replacement Reserve Account is to fund "capital repairs, replacements and improvements including the replacement of FF&E necessary to keep the Property in good order and repair and in a good marketable condition and in compliance with the Franchise Agreement or prevent deterioration of the Property" during the course of the Loan. (Loan Agreement at § 9.2(a)).  The Loan Agreement provides that funds not used for such purposes shall be disbursed to the Debtor upon the earliest of the Loan being paid in full, or the release of the Secured Noteholder's lien on the Real Estate.   (Loan Agreement at § 9.2(c); Hilke Dec. at ¶ 15).

30.     Section 9.4 of the Loan Agreement provides for the Debtor's payment of tax and insurance reserves.  (Loan Agreement at § 9.4; Hilke Dec at ¶ 16)

31.     The Secured Noteholder is holding: (i) $653,454.42 in the Replacement Reserve Account; (ii) $10 in the real estate taxes reserve (which is the amount after the payment of real estate taxes in January 2021); and (iii) $0 in the insurance reserve (after payment of the Debtor's property insurance in January 2021).  (Hilke Dec. at ¶ 17).

## The Guaranty

32.     The Debtor's obligations under the Loan are also secured by a guaranty of the Debtor's principal – Ben Mousavi ("Mousavi").  An action by the Secured Noteholder against Mousavi to collect upon the Guaranty is currently pending before the United States District Court for the Southern District of Texas.  (Case No. 4-20-CV-03289)  (Hilke Dec. at ¶ 18).

### The Debtor's Breaches Under The Loan And Its Substantial Improper Pre-Petition Transfers To Affiliates

33.     The Debtor breached its obligations under the Loan by failing to make its required monthly payments to the Secured Noteholder pursuant to the terms of the Loan Agreement for April through August 2020.  (Hilke Dec. at ¶ 19).

34.     Additionally, § 6.1(a)(vii) of the Loan Agreement provides that the Debtor may not "incur any debt, secured or unsecured, direct or contingent" other than the Secured Noteholder Loan or Permitted Debt. Neither the SBA Loan, nor the PPP Loan fall within the Loan Agreement's definition of Permitted Debt.  The Debtor did not obtain the Secured Noteholder's consent prior to entering into the SBA Loan or PPP Loan.  Therefore, the Debtor breached § 6.1(a)(vii) of the Loan Agreement by entering into the SBA Loan and PPP Loan without obtaining the Secured Noteholder's written consent.  (Hilke Dec. at ¶ 20).

35.     In addition to the aforementioned defaults, the Debtor made substantial improper pre-petition transfers to affiliates in express violation of its obligations under the Loan Agreement. The Secured Noteholder did not learn of these improper transfer until after the Petition Date. (Hilke Dec. at ¶ 21).

36.     For example, § 6.19(a)(xii) of the Loan Agreement prohibits the Debtor from loaning moneys to affiliates.  However, according to the Statement of Financial Affairs filed by the Debtor in this case, within the ninety-day period prior to the Petition Date, and **at a time it was**

**in payment default to the Secured Noteholder**, the Debtor loaned $49,047.00 to an affiliate of

the Debtor (Keivan's Development & Construction) for the construction of a hotel owned by a

non-debtor entity.  *See* Debtor's Statement of Financial Affairs [Dkt. No. 41 at p. 26].[5]  Between

October 2019 and February 2020, the Debtor loaned an additional $115,000 to the same affiliated

entity, again for purpose of constructing a hotel owned by a non-debtor entity.  [Dkt. No. 73 at p.

3].

      37.     Furthermore. § 6.19(a)(v) of the Loan Agreement prohibits the Debtor from making

"any investment" in another entity, and § 6.19(a)(ii) prohibits the Debtor from acquiring or owning

any assets other than its interest in the Real Property and "such incidental Personal Property as

may be necessary for the ownership and operation of the [Real] Property."  The Debtor breached

---

[5]      A copy of the Debtor's Statement of Financial Affairs and amendments [Dkt. Nos. 41, 72, 102] are annexed hereto as <u>Exhibit 13</u>.  The Debtor subsequently amended its Statement of Financial Affairs to change its position and the debtor now asserts that the transfers of such funds by the Debtor to its affiliate were not loans.  However, this position is wholly inconsistent with the testimony of the Debtor's principal at the 341 Meeting in this case.  *See* 341 Tr. at p. 43 ("MR. ZABARAUSKAS: SO you loaned – okay.  You loaned the money to Keivans Development and Construction?  MR. MOUSAVI: That's correct.  Yes sir.  Which is going to pay back us next three months.  Pay start in December.")  Based upon information and belief, these affiliate loans have not been repaid.

      At the 341 Meeting, Mr. Mousavi also originally testified that the funds that were loaned by the Debtor to Keivans Development and Construction were funds loaned to the Debtor by the SBA.  See 341 Tr. At 42 ("So for that reason, I borrow money from the company. Which is the – SBA Loan to pay them a portion of the money. ")  Apparently realizing the potential adverse legal ramifications of using proceeds from an SBA Loan to fund construction for a non-borrower entity's hotel, Mr. Mousavi quickly attempted to back-track from that position at the 341 Meeting when he testified:

      MR: ZABARAUSKAS: Okay. So wait a minute – so these payments – these monies, the 36,000 and change and 12,560, those were monies you received from the SBA Loan?
      MR BEN MOUSAVI: No, no, no, no, no, no.
      MR. ZABARAUSKAS: Okay.
      MR. BEN MOUSAVI: That's the money I received from the loan and able to use that to pay that – that balance I do have with those companies.
      MR. ZABARAUSKAS: So wait a minute.  So you got the money from the SBA.
      MR. WENTWORTH: Let me – let me –
      MR. ZABARAUSKAS:  Did you use the money that you got from the SBA to make these two payments?
      MR. BEN MOUSAVI:  No. It's – It's not – I use the SBA loan because the money go to the corporation.
      MR. ZABARAUSKAS: Right.
      MR. BEN MOUSAVI: I use corporation money to pay that bill.  The loan – it was a loan.

(341 Meeting Tr. At p. 42-43.)

§§ 6.19(v) and 6.19(a)(ii) of the Loan Agreement by investing $1,500,000 in two affiliated entities which owns their own hotels.  *See* Amended Schedules [Dkt. No. 72], a copy of which is annexed hereto as Exhibit 15, at p. 3.[6]

38.     On July 8, 2020, the Secured Noteholder sent a notice of default (the "Notice of Default) pursuant to the Debtor pursuant to the terms of the Loan Agreement.  A copy of the Notice of Default is annexed hereto as Exhibit 14.  (Hilke Dec. at ¶ 24).

### The Debtors' Post-Petition Performance And Projections

39.     The Debtor's post-petition operations have been insufficient to pay operating expenses, debt service, real estate taxes and insurance reserves.  (Hilke Dec. at ¶ 25).

40.     The Debtor refused to provide for the payment of adequate protection to the Secured Noteholder, or for the payment of taxes and insurance reserves in connection with the initial cash collateral order entered in this case, which governed the four month period from September 1, 2020 through December 31, 2020. [Dkt. No. 50].  (Hilke Dec. at ¶ 26)

41.     Thus, while the Debtors' monthly operating reports purport to show positive net income of $10,573.84, $30,292.73 and $29,027.97 for September, October and November 2020 [Dkt. No. 111 at p. 7], net income for each of those months would have been negative had the Debtor been required to pay debt service and tax and insurance reserves.[7]   (Hilke Dec. at ¶ 27).

42.     Moreover, the Debtor's monthly operating report for December 2020 shows that the posted a loss of $32,538.96, again, without even taking into account debt service and tax and insurance reserves.  [Dkt. No. 111 at p. 7].  (Hilke Dec. at ¶ 28).[8]

---

[6]     The Debtor's Amended Schedules of Assets do not explain what interest the Debtor received for this $1,500,000 investment.  *See* Amended Schedules of Assets [Dkt. No. 72] at p. 3.

[7]     In December 2020, the parties submitted an Amended Agreed Cash Collateral Order, which was entered by the Court.  This order requires the Debtor to transfer all cash in its debtor-in-possession account in excess of $125,000 at the end of the month to the Secured Noteholder.  [Dkt. No. 95 at ¶ 3].

[8]     A copy of the Debtor's monthly operating report for December is annexed hereto as Exhibit 17.

43.     The Debtor's budget under the Amended Agreed Cash Collateral Order projects negative cash flow of $28,417 in January 2021 and positive cash flow of only $1,656 in February 2021, each without taking into account debt service, and real estate and insurance reserves.  [Dkt. No. 95 at p. 4].[9]

44.     **Indeed, the Debtor's own financial projections, which are attached to its Disclosure Statement (as hereafter defined), show that the Debtor expects to be operating at a negative cash flow for six of the first seven month under its Plan.**  [Dkt. No. 106-3 at p. 1].

### The Debtor's Plan

45.     On January 15, 2021, the Debtor filed its plan of reorganization (the "Plan") [Dkt. No. 105] and disclosure statement (the "Disclosure Statement") [Dkt. No. 106].  A copy of the Plan is annexed hereto as Exhibit 9.  A copy of the Disclosure Statement is annexed hereto as Exhibit 10.

46.     On January 19, 2021, the Court entered an order conditionally approving the Disclosure Statement, and scheduling a combined hearing on March 3, 2021 with respect to final approval of the Disclosure Statement and confirmation of the Plan.  [Dkt. No. 108].

47.     The Plan contains five classes of claims, consisting of: (i) Ad Valorem Tax Claims, which were paid in full pursuant to the Amended Agreed Cash Collateral Order [Dkt. No. 95 at ¶ 4; Hilke Dec. at ¶ 27, fn 2]; (ii) the Secured Noteholder's Claim, which is impaired; (iii) the SBA Claim, which is unimpaired; (iv) Hilton's cure claim arising from the Debtor's assumption of the Franchise Agreement, which under Fifth Circuit authority is an administrative claim and not entitled to vote on the Plan; and (v) general unsecured claims, of which there are none.

---

[9]     A copy of the Amended Agreed Cash Collateral order is annexed hereto as Exhibit 16.

48.     With respect to the Secured Noteholder, the Plan provides that: (i) the Secured Noteholder's claim will be fixed at $7,692,755.69 (as opposed to $8,919,307.66 as set forth in the Proof of Claim) plus post-petition interest at the non-default contract rate plus reasonable legal fees and expenses minus payments received by the Secured Noteholder post-petition; (ii) the Secured Noteholder's claim will be amortized over a thirty-year period (as opposed to a twenty year period as provided in the Loan Agreement); (iii) the Secured Noteholder will receive monthly payments with a balloon payment of approximately $7,418,000 due on August 1, 2023; (iv) the Secured Noteholder is required to turnover to the Debtor all funds in the Reserve Replacement Account which are in excess of $200,000; and (v) the Secured Noteholder's Guaranty Action is stayed until such time that the Debtor defaults under the Plan, and fails to cure such default.  (Plan at § 4.4).

49.     The Secured Noteholder opposes the Plan and will be voting to reject the Plan, as well as any other plan filed by the Debtor in this case.

50.     Additionally, as set forth in more detail below, the Plan is not confirmable over the Secured Noteholder's objection for a variety of reasons, including that:

> (i) the Debtor cannot obtain an impaired accepting class of claim to vote in favor of the Plan as required by § 1129(a)(10) of the Bankruptcy Code;
>
> (ii) the Plan's requirement that the Secured Noteholder turnover funds from the Replacement Reserve Account to the Debtor is impermissible; and
>
> (iii) the Plan is not feasible.[10]

---

[10]     The Secured Noteholder submits that there are additional reasons why the Plan cannot be confirmed, which will be set forth in its objection to confirmation of the Plan, including that the Plan contains an improper post-confirmation stay of the Secured Noteholder's Guaranty Action against the Debtor's principal.  *See* Plan at § 11.6.

## The Lift Stay Motion

51.     On January 25, 2021, the Secured Noteholder filed the instant motion seeking relief from the automatic stay.

### The Court Should Vacate The Automatic Stay
### As To The Secured Noteholder

52.     Section 362(d) of the Bankruptcy Code provides in pertinent part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling or modifying or conditioning such stay –
>
> (1)     for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2)     with respect to a stay of an act against property under subsection (a) of this section if –
>
> > (A)     the debtor does not have equity in such property; and
> >
> > (B)     such property is not necessary to an effective reorganization.

53.     Pursuant to § 362(g) of the Bankruptcy Code, the debtor bears the burden of establishing that:  (i) cause does not exist for relief from stay under § 362(d)(1); and (ii) property is necessary for an effective reorganization.  The movant bears the burden of establishing a lack of equity in the Property.  *See*, *e.g.*, *In re Hallwood Energy, L.P.*, 2009 WL 1917418 at *4 (Banker. N.D. Tex. 2009); *In re Northwest Timberline Enterprises, Inc.*, 348 B.R. 412, 430 (Banker. N.D. Tex. 2006).

54.     In the instant case, relief from the automatic stay is proper under both § 362(d)(1) and § 362(d)(2) of the Bankruptcy Code.

## The Court Should Grant The Secured Noteholder Relief
## From The Automatic Stay Under Bankruptcy Code 362(d)(2)

55.     Relief from the automatic stay under Bankruptcy Code § 362(d)(2) is appropriate in this case because the Debtor lacks equity in the Secured Noteholder's collateral (the "Collateral"), and the Collateral is not necessary for an effective reorganization.

### The Debtor Lacks Equity In The Secured Noteholder's Collateral

56.     For the purposes of § 362(d)(2)(A), "equity" refers to the difference between the value of the subject property and the encumbrances upon it.  *In re Sutton*, 904 F.2d 327, 329 (5th Cir. 1990).

57.     As set forth above, the value of the Secured Noteholder's Collateral is $8,350,000, consisting of: (i) the Real Property ($7,300,000); (ii) the FFE ($900,000), and Debtor's Cash (approximately $125,000).  *See* Appraisal.

58.     The amount of liens on such assets as of the Petition Date were $9,119,475.16, consisting of the Secured Noteholder's claim ($8,919,307.66 set forth in the Proof of Claim plus $50,167.50 in post-petition legal fees and expenses and servicing fees) and the SBA Loan ($150,000).

59.     Therefore, the Debtor lacks equity in the Collateral because the amount of liens on the Collateral exceeds the value of the Collateral.

### The Secured Noteholder's Collateral,
### Is Not Necessary For An Effective Reorganization

60.     In order to establish that property is necessary for an effective reorganization for purposes of § 362(d)(2)(B) of the Bankruptcy Code, "courts usually require the debtor to do more than manifest unsubstantiated hopes for a successful reorganization."  *In re Canal Place, L.P.*, 921 F.2d 569, 577 (5th Cir. 1991) *quoting United Sav. Ass'n of Tex. v. Timber of Inwood Forest Assocs., Ltd.*, 808 F.3d 363, 370 (5th Cir. 1987) (*en banc*) *aff'd* 484 U.S. 365, 108 S. Ct. 626

(1988); *In re Hallwood Energy, L.P.*, 2009 WL 1917418 at \*3 (Bankr. N.D. Tex. 2009)  "However honest in its efforts it may be, and however sincere the motives, the [Court] is not bound to clog its dockets with visionary or impractical schemes for resuscitation."  *In re Northwest Timberline Enterprises, Inc.*, 412 B.R. 348, 430 (Bankr. N.D. Tex. 2006).

61.     The debtor must show a reorganization "that is in prospect.  This means … that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *United Sav. Ass'n of Tex. v. Timber of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-376, 108 S. Ct. 626 (1988).  "If market conditions are such that an effective plan of reorganization cannot be developed that is fair and equitable to dissenting creditors [a secured creditor] is entitled to foreclose on its liens."  *In re D&F Construction, Inc.*, 865 F.2d 673, 676 (5th Cir. 1989).

### 1.     The Debtor Cannot Obtain An Impaired Class Of Claims To Accept Its Plan As Required By Bankruptcy Code § 1129(a)(10)

62.     The Debtor cannot reorganize in this case because it cannot satisfy Bankruptcy Code § 1129(a)(10)'s requirement that a plan of reorganization be accepted by at least one impaired class of claims, not including the votes of insiders.  11 U.S.C. § 1129(a)(10).  The case law is clear that without an impaired accepting class of claims, a debtor is unable to satisfy its burden of establishing that property is necessary for an effective reorganization, as required by Bankruptcy Code § 362(d)(2)(B).  *See, e.g., In re Northwest Timberline Enterprises, Inc.*, 348 B.R. at 436 (holding that no reasonable prospect of reorganization where "the Court sees no way that the Debtor… could ever have a legitimate impaired accepting class of creditors to go to cram down.").

63.     In the instant case the Plan states that it contains four impaired classes of claims: (i) Class 1, consisting of Ad Valorem Tax Claims; (ii) Class 2, consisting of the Secured

Noteholders claim; (iii) Class 4, consisting of Hilton's cure claim under the Franchise Agreement; and (iv) Class 5, consisting of general unsecured claims.

64.     Class 1 cannot be an impaired accepting class because the only Ad Valorem Tax Claim were the real estate taxes on the Real Property, which were paid by the Secured Noteholder pursuant to the terms of the Amended Agreed Cash Collateral Order. (Hilke Dec. at ¶ 27, fn 2).

65.     Class 2 is the Secured Noteholder's claim, and the Secured Noteholder will not accept the Plan, or any other plan filed by the Debtor. (Hilke Dec. at ¶ 33).

66.     Class 4, consisting of Hilton's cure claim in connection with the Franchise Agreement, cannot as a matter of law be an impaired accepting class of claims within the meaning of Bankruptcy Code § 1129(a)(10) because the Fifth Circuit has held that claims pursuant to contracts that are being assumed are administrative in nature and therefore are ineligible to vote to accept or reject a plan.

67.     In *In re Greystone*, 995 F.2d 1274, 1281 (5th Cir. 1991), in addressing a class of claim under leases, (whose requirement for assumption or rejection under § 365 is identical to the treatment of executory contracts), held:

> A debtor in Chapter 11 must either assume or reject its leases with third parties.  11 U.S.C. § 365. If the debtor does neither, the leases continue in effect and the lessees have no provable claim against the bankruptcy estate. *See Matter of Whitcomb & Keller Mortgage Co.*, 715 F.2d 375, 378–79 (7th Cir.1983);  *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir.1983). Under the Code, only creditors are entitled to vote on a plan of reorganization. See 11 U.S.C. § 1126(c). A party to a lease is considered a "creditor" who is allowed to vote, 11 U.S.C. § 1126(c), only when the party has a claim against the estate that arises from rejection of a lease.  *In re Perdido Motel Group, Inc.*, 101 B.R. 289, 293–94 (Bankr.N.D.Ala.1989). **If, however, the debtor expressly assumes a lease, the lessee has no "claim" against the debtor under § 1126(a). See 11 U.S.C. §§ 365(g), 502(g). The rights created by assumption of the lease constitute a post-petition administrative claim under section 503(b)(1)(A) of the Code.  *LJC Corp. v. Boyle*, 768 F.2d 1489, 1494 n. 6 (D.C.Cir.1985). The holder of such a claim is not entitled to vote on a plan of reorganization**.

11 U.S.C. § 1126(a); *In re Distrigas Corp.*, 66 B.R. 382, 385–86 (Bankr.D.Mass.1986). Here, Greystone never rejected its leases with the tenants. There is thus no support for the assertion that the tenants' "claims" entitled them to vote on Greystone's Plan.[11]

(emphasis supplied). *See also In re Bakarat*, 99 F.3d 1520, 1528 (9th Cir. 1520, 1528 (9th 1996)( "The obligations assumed by the debtor under the continued leases constitute post-petition administrative claims under § 503(b)503(b)(1)(A).")

68.     In the instant case, since the Plan provides for the Debtor's assumption of the Franchise Agreement, Hilton's cure claim under such agreement is an administrative expense claim under § 503 of the Bankruptcy Code and therefore ineligible to vote on the Plan. Accordingly, Hilton's cure claim cannot constitute an impaired accepting class of claims under § 1129(a)(10).

69.     Finally, Class 5, allegedly consisting of unsecured claims, cannot constitute an impaired accepting class of claims.  No general unsecured claims were filed by the bar date in this case.  The only general unsecured claim listed in the Debtor's schedules of liabilities is a $151,635.00 claim of Allegiance arising from the PPP Loan.  However, the PPP Loan is subject to full forgiveness under the PPP Loan Program.

70.      According to Debtor's counsel, Allegiance sent a communication to the Debtor stating: "We are pleased to inform you that the SBA has approved your PPP forgiveness application, but you have a partial balance of ($10,000) remaining that was not forgiven, due to the SBA's deduction of your EIDL advance from your loan forgiveness amount."  *See* January 20, 2021 email from Debtor's counsel, a copy of which is annexed hereto as Exhibit 11.

---

[11]     This is also consistent with Bankruptcy Cope § 1123(a)(1) which provides that a plan shall "designate classes of claims, **other than claims specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title.**" (emphasis supplied).  *See In re Distrigas Corp.*, 66 B.R. 382, 385 *Bank. D. Mass 1986)("Congress never intended administrative clams to vote on the plan and illustrated that intent by specifically excluding adminstrative claims as constituting a class.")

71.     However, on December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act was signed into law (the "Economic Aid Act").  The Economic Aid Act repealed the exception of EIDL Advances from loan forgiveness under the PPP Loan Program, and the $10,000 EIDL is now fully forgiven.

72.     This legal point is acknowledged in a January 8, 2021 SBA Procedural Notice which states:

> Section 1110(e)(6) of the Coronavirus Aid Relief, and Economic Security Act (CARES Act) required SBA to deduct the amount of any Economic Injury Disaster Loan (EIDL) Advance received by a PPP borrower from the PPP loan forgiveness payment remitted by the SBA to the PPP lender.  On October 2, 2020, SBA began remitting forgiveness payments to PPP lender, with the required EIDL Advance deductions.  On December 27, 2020, the President signed the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (Economic Aid Act), which repealed Section 1110(e)(6) of the Cares Act.[12]
>
> …
>
> **For those loans where SBA remitted a forgiveness payment to a PPP lender that was reduced by an EIDL Advance, SBA will automatically remit a reconciliation payment to the PPP lender for the previously deducted EIDL Advance amount, plus interest through the remittance date.**

*See* SBA Procedural Notice, a copy of which is annexed hereto as <u>Exhibit 12</u>. (emphasis supplied).

73.     As a result, Allegiance does not hold a general unsecured claim in this case, and there exist no general unsecured creditors that could vote in Class 5. 15 U.S.C. § 9005(c)(1)("Amounts which have been forgiven under this section shall be considered canceled indebtedness by a lender authorized under section 636(a) of this title.")

74.     Accordingly, the Plan cannot be confirmed because there is no impaired class of claims to vote in favor of the Plan.

---

[12] See Section 333 of the Economic Aid Act.

2.      **The Plan Is Not Confirmable Because The Secured Noteholder Can Not Be Required To Turn Over Funds From The Replacement Reserve Account To The Debtor For Its Use Under The Plan**

75.      The Plan also cannot be confirmed because it does not comply with the applicable provisions of the Bankruptcy Code as required by Bankruptcy Code § 1129(a)(1).  The Plan improperly seeks to require the Secured Noteholder to turn over in excess of $450,000 held in the Replacement Reserve Account to the Debtor to funds operations or make payments under the Plan.[13]

76.      In *In re Square 67 Ltd. Partnership*, 2012 WL 5842672 at (Bankr. N.D. Tex. 2012), the Court stated:

> "[t]he general rule regrading estate property is that the estate is entitled to the same rights that the debtor held prior to the filing of the bankruptcy." *See In re Dolphin Titan Int'l, Inc.*, 93 B.R. 508, 512 (Bankr. S.D. Tex. 1988)(*citing Bank of Marin v. England*, 385 U.S. 99, 87 S. Ct. 274, 17 L.Ed.2ed (1966)).  It follows that if a debtor, such as the Debtor in this case, lacks the right to possess or use property at the commencement of a case, then the debtor cannot use a turnover action to create such rights. *See In re Lauria*, 243 B.R. 705, 709 (Bankr. N.D. Ill. 2000).

77.      In the *Square 67* case, the Court held that the debtor was not entitled to a turnover of reserves held by its lender because "[b]ased upon the terms agreed to by the parties, the Debtor did not have the right to control the reserves funds when the bankruptcy case was filed." *Id*.

78.      Other courts have similarly denied a debtor or trustee's request for the turnover of reserve accounts which the Debtor did not have a right to access prior to its bankruptcy filing.  *In re Dolphin Titan Int'l*, 93 B.R. 508, 512 (Bankr. S.D. Tex. 1988)(holding that Debtor was not entitled to turnover of funds where debtor only had a contingent right to excess funds in the future);

---

[13] The Plan requires the Secured Noteholder to turn over all funds in the Replacement Reserve Account in excess of $200,000.  (Plan at § 4.4; As of January 19, 2021, there was $653,454.42 in the Replacement Reserve Account. (Hilke Dec. at ¶ 17).

*In re Amco Products, Inc.*, 50 B.R. 723, 725 (W.D. Mo. 1983)(holding that trustee was not entitled to funds in a reserve account which the debtor had no right to access prior to bankruptcy filing).

79.     In the instant case, the Debtor had no right to access the Replacement Reserve Account prior to the Petition Date.  The funds in the Replacement Reserve Account may only be used for Replacements as defined in the Loan Agreement.  (Loan Agreement at § 9.2).  The Debtor has no right to the funds in the Replacement Reserve Account until the Loan is paid in full.  (Loan Agreement at § 9.2(c), § 9.8(c)).[14]

80.     Additionally, § 553 of the Bankruptcy Code prohibits a plan from impairing a creditor's right to set-off.  *See* Bankruptcy Code § 553(a)("Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect the right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case").  *See also In re Ronnie Dowdy, Inc.*, 314 B.R. 182 (Bankr E.D. Ark. 2004)(noting that Chapter 11 plan could not affect creditor's setoff right)

---

[14]     Loan Agreement § 9.2(c) provides:

> All sums on deposit in the Replacement Reserve Account shall be disbursed to Borrower upon the earliest to occur of; (i) payment in full of the Debtor or (ii) the release of the Lien of the Mortgager and all related obligations in accordance with the terms of this Agreement and the other Loan Documents, provided no Event of Default is then continuing,

Section 9.8(c) of the Loan Agreement provides, in part:

> Borrower shall have no right of withdrawal from the Reserve Accounts or any other right or power with respect to the Reserve Accounts or any or all of the Reserve Funds now or hereafter deposited in the Reserve Accounts, except as expressly provided in this Agreement.

81.     In the instant case, § 9.8(b) of the Loan Agreement provides that the Secured Noteholder has a first priority security interest in the funds in the Replacement Reserve Account. (Loan Agreement at § 9.8(b)).[15]

82.     Section 9.8(f) of the Loan Agreement and § 8.2(j) of the Leasehold  Deed of Trust give the Secured Lender, in the event of default, the right to set-off against any reserves that it is holding.  *See* Loan Agreement at § 9.8(f)(in event of default "Lender may use and disburse the Reserve Funds" for, *inter alia*, repayment of the Loan, reimbursement of the Secured Noteholder "for all losses, fees, costs and expenses (including without limitation reasonable legal fees)," payment of any amount expended in exercising its rights and remedies, payment of any amount as required or permitted by the Loan Agreement or any other purpose provided under the Loan Agreement.")  *See also* Leasehold Deed of Trust at § 8.1(j)(upon event of default, Secured Noteholder may "apply any sums then deposited or held in escrow or otherwise by or on behalf of the Lender in accordance with the terms of the Loan Agreement, this Security Agreement or any other Loan Document…")

83.     Therefore, the Plan's requirement that the Secured Noteholder turnover funds from the Replacement Reserve Account to the Debtor impermissibly impairs the Secured Noteholder's set-off rights under Bankruptcy Code § 553 and its security interest in the funds in the Replacement Reserve Account.  As a result, the Plan does not comply "with the applicable provisions of title

---

[15]     Section 9.8(b) of the Loan Agreement provides, in part:

> Borrower grants to Lender a first-priority perfected security interest in, and assigns and pledges to Lender, each of the Reserve Accounts and any all Reserve Funds now or hereafter deposited in the Reserve Accounts as additional security for payment of the Debt, Unless expended or applied in accordance herewith, the Reserve Accounts and the Reserve Funds shall constitute additional security for the Debt.  The provisions of this Section 9.8 are intended to give Lender "control" of the Reserve Accounts within the meaning of the U.C.C.

11" as required for plan confirmation under Bankruptcy Code § 1129(a)(1), and the Plan cannot be confirmed.

       **3.**      **The Debtor Can Not Propose A Feasible Plan**

84.      The Debtor also cannot propose a plan which satisfies the feasibility requirement for confirmation under Bankruptcy Code § 1129(11). "The feasibility test contemplates the probability of actual performance of the provisions of the plan, and whether things can be done as a practical matter under the facts. *See*, *e.g.*, *In re M & S Assocs.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992).

85.      As noted by the Fifth Circuit:

> When operating revenues fund a plan, a debtor's past and present financial records are probative of the plan's feasibility. *In re Hobbie-Diamond Cattle Co.*, 89 B.R, 856, 858 (Bankr. D. Mont. 1988)… Speculative, conjectural or unrealistic projections by Debtor cannot support Debtor's production of future performance. *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983)

86.      Additionally, "the proponent must prove that the debtor will have available credit and the ability to meet capital expenditures." *In re M&S Assocs.*, 138 B.R. 849 (Bankr. W.D> Tex. 1992).

87.      During this bankruptcy case, the Debtors have generated insufficient cash flow to pay debt service, and real estate tax and insurance reserves.

88.      Moreover, the financial projections contained in the Debtor's own Disclosure Statement (as hereafter defined) show the Debtor operating at a negative cash flow for six of the first seven months under its Plan. In other words, the Debtor projects that it will lack sufficient revenues to pay operating expenses and make payments under the Plan.

89.      While the Debtor's revenues for November and December 2020 were $94,354 and $77,879, respectively [Dkt. No. 111 at p. 1], the Debtor's revenue projections for May through

November of this year inexplicably show revenues of $130,000 in March to $210,000 in November [Dkt. No. 106-3 at p. 1].  And, the Debtor's projections show that this alleged increased income will still be insufficient to support the payment of operating expenses, debt service and taxes and insurance reserves under the Plan for six of the first seven months following confirmation of the Plan.  Thus, based upon the Debtor's own operating reports and projections, the Plan is not feasible.

90.     Additionally, the Plan requires the Debtor to pay an approximately $7,418,000 balloon payment to the Secured Noteholder on August 1, 2023.   (Hilke Dec. at ¶ 32).

91.     As part of its burden to establish feasibility of its Plan, the Debtor must demonstrate how it will be able to make the balloon payment.  However, the Debtor's Disclosure Statement contains no evidence as to how the Debtor would be able to make the substantial balloon payment due to the Secured Noteholder under the Plan approximately two and half years from now.

92.     Accordingly, the Debtor cannot propose a feasible, confirmable plan of reorganization.

93.     The Debtors are unable to establish a reasonable likelihood of a successful reorganization in this case within the meaning of Bankruptcy Code § 362(d)(2)(B).  Therefore, the Secured Noteholder should be granted relief from the automatic stay under Bankruptcy Code § 362(d)(2).

**Cause Exists For Granting The Secured Noteholder Relief From The Automatic Stay Under Bankruptcy Code § 362(d)(1)**

94.     Relief from the automatic stay should also be granted for "cause" under Bankruptcy Code § 362(d)(1). Because the term "cause" is undefined in the Bankruptcy Code, courts must determine cause on a case-by-case basis based upon the totality of the circumstances. *In re Reitnauer*, 152 F.3d 341, 343 & fn 4 (5th Cir. 1998); *In re WGMJR, Inc.*, 435 B.R. 423, 432 (Bankr. S.D. Tex. 2010).

95.     Courts have found cause for granting stay relief where the debtor is unable to effectuate a plan.  *See, e.g., In re Edwards*, 2019 WL 1458872, at *1 (Bankr. D. Conn. 2019) (lifting the automatic stay under 362(d)(1) and (4) for, *inter alia*, proposing a patently unconfirmable plan);  *In re MDM Golf of Gillette Ridge, LLC*, 2014 WL 7359077, at *7 (Bankr. D. Conn. Dec. 23, 2014) (lifting the automatic stay under 362(d)(1) and 362(d)(3) because the debtor's plan was not feasible or confirmable).

96.     As set forth above, the Plan is not confirmable.  Accordingly, cause also exists under Bankruptcy Code § 362(d)(1) to grant the Secured Noteholder relief from the automatic stay.

### Grounds Exist To Waive Bankruptcy Rule 4001(A)(3) Fourteen Days Stay Upon Entry Of An Order Granting Stay Relief

97.     Bankruptcy Rule 4001(a)(3) provides that "unless the court orders otherwise" an order granting a movant relief from the automatic stay is stayed for a period of 14 days after entry of the order.  In light of the facts set forth above, the Court should waive Bankruptcy Rule 4001(a)(3)'s 14 day stay.

WHEREFORE, the Court should grant the Motion and enter an order in the form annexed hereto, vacating the automatic stay with respect to the Secured Noteholder to allow it to foreclose on its Collateral, and to seek the appointment of a receiver in a state or federal court action.

**DATED:** January 25, 2021                    Respectfully submitted,

THOMPSON & KNIGHT LLP

            /s/ *Bruce J. Zabarauskas*
            Bruce J. Zabarauskas
            Texas Bar No. 24095654

1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214-969-1700
E-mail: bruce.zabarauskas@tklaw.com

*Attorneys for U.S. Bank, National Association as Trustee for the Benefit of Registered Holders of Morgan Stanley Bank of America Merrill Lynch Trust 2013-C12, Commercial Mortgage Pass-Through Certificates Series 2013 C-12*

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 4001-1(a)(1)</u>

On January 22, 2021, undersigned counsel for the Secured Noteholder spoke to Debtor's counsel Timothy Wentworth concerning the Secured Noteholder's intent to such relief from the automatic stay. Mr. Wentworth indicated that the Debtor opposed such relief.

/s/ Bruce J. Zabarauskas
Bruce J. Zabarauskas

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 25, 2021, a true and correct copy of the foregoing has been served: (i) on all parties entitled to service via this Court's Case Management/Electronic Case Filing System ("<u>CM/ECF</u>"); (ii) by first class mail on all parties listed on the attached service list; and (iii) by Federal Express upon the Debtor and its counsel at the following addresses: (a) Keivans Hospitality, Inc., Attn: Ben Mousavi, President, 22055 Katy Freeway, Katy, Texas 77450-1739; (ii) Keiv Hospitality, LLC, Attn: Ben Mousavi, President, 22055 Katy Freeway, Houston, Texas 77450-1739; and (iii) Timothy Wentworth, Esq., Okin Adams LLP, 1113 Vine Street, Suite 240, Houston, TX 77002-1044.

*/s/ Bruce J. Zabarauskas*
Bruce J. Zabarauskas

Keivans Hospitality Inc.
Att: Ben Mousavi, President
22055 Katy Freeway
Houston, TX 77450-1739

Linebarger Goggan Blair & Sampson LLP
C/O John P. Dillman
PO Box 3064
Houston, TX 77253-3064

Keiv Hospitality LLC
Att: Ben Mousavi, President
22055 Katy Freeway
Houston, TX 77450-1739

Allegiance Bank
PO Box 41314
Houston, TX 77241-1314

Texas Comptroller of Public Accounts, Revenue
Christopher S. Murphy
c/o Sherri Simpson, Paralegal
PO Box 12548
Austin, TX 78711-2548

Chad W. Cowan
U.S. Attorney's Office
1000 Louisiana St. Suite 2300
Houston, TX 77002

Harris County Tax Assessor
PO Box 4663
Houston, TX 77210

Ben Mousavi
2314 Colby Lodge Drive
Katy, TX 77450-7508

Texas Secretary of State
PO Box 13697
Austin, TX 78711

Guaranty Bank & Trust
c/o Glen Patrick
McNally & Patrick, LLP
100 E. Ferguson, Ste 400
Tyler TX 75702-5758

United States Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530

Small Business Administration
Office of Disaster Assistance
14925 Kingsport Road
Fort Worth, TX 76155

Hilton Worldwide, Inc.
c/o David Trausch
Haynes and Boone, LLP
1221 McKinney Street, Suite 4000
Houston, TX 77010-2008

Harris County et al.
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
P.O. Box 3064
Houston, TX 77253-3064

Hilton Worldwide
4649 Paysphere Circle
Chicago, IL 60674-0001

Mousavi, LLC
22055 Katy Freeway
Katy, TX 77450-1739

JPMORGAN CHASE BANK N A
BANKRUPTCY MAIL INTAKE TEAM
700 KANSAS LANE FLOOR 01
MONROE LA 71203-4774

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Timothy L. Wentworth
Okin Adams LLP
1113 Vine St., Suite 240
Houston, TX 77002-1044

Small Business Administration
Little Rock Commercial Loan Service Center
Office of Financial Program Operations
2120 Riverfront Drive
Little Rock, AR 72202

Melissa A Haselden
Hoover Slovacek LLP
Galleria II Tower
5051 Westheimer, Suite 1200
Houston, TX 77056-5839

United States Small Business
Administration
Att. Jeffrey Hue
8701 S. Gessner Rd., Ste. 1200
Houston, TX 77074-2944

Texas Workforce Commission
101 E 15th Street
Austin, TX 78778

Comptroller of Public Accounts
c/o Office of the Attorney General
Bankruptcy Collections Division MC-008
P.O. Box 12548
Austin, TX 75711-2548

Guaranty Bank & Trust
Att: Joseph M. Rose
P.O. Box 1158
Mount Pleasant, RX 75456-1158

Walter J. Cicack
Hawash, Cicack & Gaston
3401 Allen Parkway, Suite 200
Houston, TX 77019